## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

Alysse DellaTorre,

      **Plaintiff,**

   v.

**Rosalind Franklin University of Medicine and Science,**

      **Defendant.**

## COMPLAINT

Plaintiff, Alysse DellaTorre, by and through her attorney, T. Andrew Horvat of Horvat Law, LLC, brings this action for violations of the American with Disabilities Act, Section 504 of the Rehabilitation Act, and related claims in violation of Illinois law. In support thereof, Ms. DellaTorre asserts as follows:

### Jurisdiction and Venue

1. This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §1331 as Plaintiff seeks redress for Defendant's violations of federal law.

2. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367.[1]

3. Venue is proper pursuant to 28 U.S.C. U.S.C. § 1391(b) because a substantial part of the

---

[1] Plaintiff has filed a complaint with the Illinois Department of Human Rights for violations of the Illinois Human Rights Act. Once granted the right to bring suit for violations of the Act, Plaintiff will seek leave of this Court to amend her complaint to include these additional claims.

events and omissions giving rise to Plaintiff's claims occurred within this judicial district.

**Parties**

4. Alysse DellaTorre ("Plaintiff" or "Ms. DellaTorre") is the Plaintiff in the above-entitled matter. Ms. DellaTorre is a former student at Rosalind Franklin University of Medicine and Science who at all relevant times resided within the Northern District of Illinois.

5. Defendant, Rosalind Franklin University of Medicine and Science ("Defendant" or "RFU") is a private graduate school and a place of public accommodation under Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181 *et seq*. ("ADA").

6. RFU is located in North Chicago, IL.

7. On information and belief, RFU is a recipient of federal funding pursuant to Section 504 of the Rehabilitation Act, 29 U.S.C § 794 *et seq*.

**Facts**

8. In May of 2023, Plaintiff moved to the Chicago-land area in anticipation of enrolling at RFU's pathologists' assistant program ("PA program") within its College of Health Professions.

9. Defendant's PA program was a twenty-two (22) month program divided into eight (8) quarters. The first year of the PA program was a classroom year followed by a second year consisting of clerkships.

10. At all relevant times,. in order to graduate from Defendant's PA program, it students were required to successfully complete the didactic and clinical curriculum, totaling 119.5 quarter hours, with a cumulative grade-point average of a 2.0 (C) or better on a 4.0 scale.

11. Upon successful completion of the program, students will then be eligible for graduation and to take the American Society for Clinical Pathology's certification exam.

12. Plaintiff's intent in enrolling in the PA program was to obtain her Master's of Science degree as a pathologist's assistant.

13. In the Summer of 2023, Plaintiff matriculated to Defendant's PA program.

14. In exchange for paying tuition to Defendant, Defendant agreed to confer a Master's of Science degree to Plaintiff upon her completion of the degree's requirements.

15. In addition, and in consideration for tuition paid, Defendant, its employees, and Plaintiff relied upon and agreed to abide by the rules and procedures promulgated and outlined in its student handbooks and other university literature.

16. During her first four (4) quarters in the program, Plaintiff passed all her classes thereby entitling her to move on to the clerkship portion of the program.

**Plaintiff's Disabilities Permanently and Significantly Impact Major Life Functions.**

17. Despite her initial success, at all relevant times Plaintiff suffered from several disabilities including Attention-Deficit Hyperactivity Disorder (ADHD) and anxiety.

18. As at all relevant times, Plaintiff's maladies permanently and significantly impacted numerous life functions including, but not limited to, the ability to socialize, concentrate, and process information.

19. At all times relevant, Plaintiff, with or without a reasonable modification, met and still meets the eligibility requirements for the receipt of educational services, programs, and activities provided by Defendant.

20. Due to her disabilities, Plaintiff requested and received from Defendant several educational modifications including extensions of time to complete quizzes and exams, a separate testing room to limit distractions, and excused absences so that Plaintiff could address her medical needs as they arose.

21. As a result, RFU personnel were at all relevant times aware of Plaintiff's disabilities.

**RFU's Student Handbook and Student Clerkship Manual.**

22. At all relevant times, to enforce the rights of it students, Defendant approved and published policies and procedures that must be followed before a change in the student's academic status can be effectuated.

23. Among these rights contained in Defendant's "Student Handbook" ("handbook") included a "non-discrimination policy" purporting to prohibit discrimination "on any unlawful basis (such as race, skin color, national origin, sex, including sexual orientation and gender identity, disability, age, religion, genetic information, military status, or family status) in its education programs or activities, including admission, financial aid, student activities and events, and other terms, conditions, or privileges of enrollment."

24. In addition to its non-discrimination policy, at all relevant times Defendant's student handbook and other policies precluded Defendant from taking adverse academic action against its students arbitrarily or otherwise in the absence of good cause.

25. To that end, when it is alleged that a student has violated a rule, policy or procedure a student is entitled to procedural rights before discipline can occur. Among these rights were:

   a. the right to a hearing before the Dean of Students, the student Honor Council, the Academic Promotion Committee located within each of Defendant's college or program, or the Student Affairs Judiciary Committee and its hearing officer;

   b. the right to faculty assistance throughout the disciplinary process;

   c. the opportunity to he heard during the hearing;

   d. the right to present evidence;

   e. the right to not be disciplined unless it is determined that "it is more likely than not

4

that the student committed the violation" alleged;

    f.   the right to a fair and impartial hearing; and

    g.   the right to appeal the decision.

26. In addition to the handbook, at all relevant times Defendant's "Student Clerkship Manual" outlined certain rights and conduct expectations of its students when undergoing the clinical portion of Defendant's PA program.

27. Specifically, the clerkship manual addressed what could occur if a "critical error" was made by a student while working at the student's clerkship.

28. Defined as "critical or habitual/recurring errors on behalf of the student that "jeopardized patient outcomes(e.g. diagnosis, treatment)," the clerkship manual dictates that a student committing a critical error "will receive a grade of "F" for the applicable quarter and shall be subject to dismissal from the program" in accordance with the aforementioned procedures outlined in the student handbook.

29. To guard against "critical errors" the clerkship manual promises to each student an "appropriate level of supervision, depending on the type of clinical experience (e.g. surgical pathology, autopsy pathology) and the student's level of skill."

30. Among the disciplinary actions that may be taken short of expulsion include a warning, sanction and additional training, assessment, evaluation and/or counseling.

31. At all relevant times while enrolled in the program, Plaintiff relied upon the rights and procedures guaranteed to her in Defendant's literature.

**Plaintiff is Subject to Discriminatory Conduct**

32. Despite Defendant's anti-discrimination policy, early in Plaintiff's enrollment she was the subject of discriminatory rhetoric and treatment from RFU personnel.

33. Among the discriminatory rhetoric or treatment included a statement to Plaintiff by one the program's professors that her disabilities did not need to be accommodated but that, instead, Plaintiff simply needed to "focus more."

34. At or about the same time, this same professor, in front of Plaintiff's colleagues, informed Plaintiff that she believed Plaintiff was "not trying hard enough."

35. Concerned that she was being discriminated against, Plaintiff informed the program's Director who subsequently held a mediation between Plaintiff and her professor.

36. In June of 2024, Plaintiff began her clerkship at Northwest Community Hospital ("NCH") in Arlington Heights, IL.

37. While undergoing her clerkship at NCH, Plaintiff worked under the supervision of two experienced pathologist's assistants employed by NCH.

38. As a student under the supervision of NCH personnel, Plaintiff was required to follow and comply with the directives of NCH personnel.

39. At all relevant times, NCH's pathology department had a reputation for not following industry standards with respect to its work with pathology specimens.

40. NCH's suspect reputation was known to the program's personnel at the time.

41. On August 27, 2024, RFU's Director of Clinical Education visited NCH for the purposes of conducting a site visit during which Plaintiff would be evaluated.

42. During this visit, a dispute arose between Plaintiff and the program's Director of Clinical Education regarding the timing of Plaintiff's lunch which had to be taken at a certain time due to Plaintiff's disabilities.

43. During the dispute, the Director of Clinical Education mocked Plaintiff and her disabilities.

44. Upon completion of the site visit, Plaintiff immediately contacted the program's Director of Clinical Education to complain about the discriminatory treatment and express her concerns about being retaliated against.

45. In short time, Plaintiff's concerns would be validated.

**Plaintiff is Dismissed from RFU**

46. On September 3, 2024, Plaintiff was assigned to examine a pathology specimen for malignancy.

47. While working under the direct supervision of a pathologist's assistant employed by NCH, Plaintiff was instructed to cease her dissection early and without dissecting all lymph nodes present in the specimen.

48. Despite voicing her concerns the directive, the NCH pathologist's assistant informed Plaintiff that no further dissection was needed and that if further work was required they could return to it.

49. The NCH pathologist assistant then reviewed and signed off on Plaintiff's work before sending the specimen back to the pathologist.

50. Despite doing exactly as instructed, on September 19, 2024, Plaintiff received notification that she had committed a "critical error" during her September 3, 2024, dissection.

51. Specifically, it was alleged that Plaintiff did not dissect all of the lymph nodes present in the specimen she was working on that day.

52. On September 30, 2024, a hearing was conducted regarding the allegation.

53. During this hearing, and in correspondence leading up to the hearing, Plaintiff informed the program's personnel that she acted at the direction of NCH personnel as required.

54. Importantly, at no point in time was Plaintiff ever informed of why her dissection was

deemed to be a critical error.

55. In fact, the incomplete dissection was not a critical error per program policy as the patient's treatment and/or diagnosis was not jeopardized.

56. Moreover, despite informing Defendant that she was following the directive of NCH personnel, Defendant did not attempt to verify Plaintiff's claims regarding the directive to cease her work on the pathology sample.

57. On October 4, 2024, Plaintiff was informed that she was dismissed from the program despite a litany of less punitive alternatives.

58. Plaintiff's subsequent appeals, which included numerous letters or recommendation, including one from the NCH pathologist assistant responsible for the incomplete dissection, were summarily ignored or dismissed.

59. Moreover, throughout the disciplinary process, Defendant either ignored or violated its own internal policies with respect the procedures established and the contractual rights guaranteed to Plaintiff.

60. At the time Plaintiff was dismissed, Plaintiff was complying with all obligations required of her by Defendant and was on pace to timely graduate.

61. Defendant's action in summarily dismissing Plaintiff for conduct that did not rise to a violation of internal policy was discriminatory, retaliatory, and an arbitrary and capricious use of its power.

62. As a result of the Defendant's actions, Plaintiff has suffered significant injury including, but not limited to, a denial of the opportunity to complete her Master's of Science degree, loss of considerable sums of money in tuition and related expenses, a delay in entering the profession of her choosing, a loss in reputation and ability to transfer to other similar

programs, and extreme embarrassment and emotional distress.

## COUNT I
### Title III of the Americans with Disabilities Act
### Discrimination

63. Plaintiff realleges and incorporates each paragraph as stated herein.

64. As described more fully herein, Plaintiff was denied the full benefits of the services, programs, and activities provided by Defendant and was otherwise subjected to discrimination because of her disability.

65. As a result of the Defendant's actions, Plaintiff was injured.

## COUNT II
### Title III of the Americans with Disabilities Act
### Retaliation

66. Plaintiff realleges and incorporates each paragraph as stated herein.

67. As described more fully herein, Plaintiff was retaliated against due to opposing acts and practices made unlawful by the ADA.

68. As a result of Defendant's actions, Plaintiff was injured.

## COUNT III
### Section 504 of the Rehabilitation Act
### Discrimination

69. Plaintiff realleges and incorporates each paragraph as stated herein.

70. As described more fully herein, Plaintiff was denied the full benefits of the services, programs, or activities provided by Defendant and was otherwise subjected to discrimination because of her disability.

71. As a direct result of the Defendant's actions, Plaintiff was injured.

## Count IV
### Section 504 of the Rehabilitation Act
### Retaliation

72. Plaintiff realleges and incorporates each paragraph as stated herein.

73. As described more fully herein, Plaintiff was retaliated against due to opposing acts and practices made unlawful by the Rehabilitation Act.

74. As a direct result of the Defendant's actions, Plaintiff was injured.

## COUNT V
### Breach of Implied-in-Fact Contract

75. Plaintiff realleges and incorporates each paragraph as stated herein.

76. As described more fully herein, the conduct of the parties gave rise to an implied-in-fact contract that Defendant materially breached by failing to comply with its contractual obligations and dismissing Plaintiff without just cause.

77. Defendant's actions were arbitrary, capricious, and undertaken in bad faith.

78. As a result of Defendant's actions, Plaintiff was injured.

## COUNT VI
### Intentional Infliction of Emotional Distress

79. Plaintiff incorporates each paragraph of this Complaint as stated herein.

80. As described more fully herein, intending that its conduct would cause severe emotional distress, or knowing that there was a high probability that its conduct would cause severe emotional distress, Defendant engaged in conduct that caused severe emotional distress to Plaintiff.

81. As a result of Defendant's actions, Plaintiff was injured.

## COUNT VII
### Negligence

82. Pleading in the alternative to the intentional conduct alleged, and as described more fully herein, Defendant owed Plaintiff a duty to ensure and safeguard her rights in accordance with applicable federal and state law, as well as its own internal policies and procedures.

83. As described more fully herein, Defendant breached its duty by disregarding Plaintiff's rights and dismissing her from program.

84. As a result of Defendant's actions, Plaintiff was injured.

*Wherefore*, Plaintiff requests that this Court enter a judgment in her favor and against Defendants, enter an order reinstating Plaintiff to Franklin University of Medicine and Science's PA program, expunge any reference to Plaintiff's dismissal, award compensatory damages, punitive damages, attorney's fees, costs, and any other relief this Court deems just.

## Jury Trial Demanded

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

*/s/ T. Andrew Horvat*
Counsel for Plaintiff

T. Andrew Horvat
Horvat Law, LLC
155 N. Wacker Drive, Suite 4250
Chicago, IL 60606
312-803-4956
andrew@horvatlawllc.com

11